## ESTATE OF HIRAM A. PEARSONS, DECEASED.

[No. 8694; decided October 29, 1891.]

**Wills—Intention of Testator—How Determined.**—In construing a will the aim of the court is to arrive at the intention of the testator by an examination of the will, and the circumstances surrounding its execution, and the age and experience of the testator.

**Wills.—The Provisions of the Will** in this case show that the testator divided his property into two classes: First, the property held jointly with his aunts; and, second, all other property.

**Wills—Technical Words—When Given Popular Meaning.**—When a testator is not versed in the meaning of technical terms, it should be presumed that he used his words according to their ordinary meaning and in their popular sense. The words of a will should not be subjected to such a strain as to force them out of the natural channel of construction into the narrow legal groove in which the testator's mind was clearly not accustomed to travel.

**Wills—Technical Words—When Given Their Popular Meaning.**—It is the duty of the court to look for general intent of the testator, to put itself in his place, to regard coexistent circumstances, and, if a technical construction of words and phrases is at variance with the

obvious general intention, to apply a rule of interpretation which will give to language its ordinary effect.

**Wills—Construction.—While It is True that a Will Takes Effect Only from the Date** of the death, it may be construed according to the circumstances and the facts existing in the mind of the testator at the date of execution. Whenever a testator refers to an actual existing state of things, or to what he considers to be such a state, his language is referential to the date of the will and not to what may exist at the time of his death, which is a prospective event.

J. H. Moore, for executor.

Wilson & Wilson and Lloyd & Wood, for Mrs. Kinsey.

Thomas F. Barry, for absent heirs.

I. N. Thorne, J. B. Mhoon, Messrs. Kelly, Marble & Phipps, and Hermann & Soto, for certain heirs.

A. N. Drown, J. E. Foulds, M. C. Hassett, Joseph Naphtaly, A. H. Loughborough, and George W. Haight, for various orphan asylums.

COFFEY, J. This is an application on the part of the executor of the will of Hiram A. Pearsons, deceased, for a construction of that instrument, presenting for solution by the court certain questions which may be stated briefly as follows:

1. What, if any, real property described in the will was held jointly by testator with Betsey F. Mathewson and Polly Barton?

2. Which are to be designated as the orphan asylums of San Francisco, according to will?

3. Who are the legatees and devisees of specific bequests and devises, and to what are they entitled as distributees?

4. What real estate shall be sold to pay bequests?

5. Who are the next of kin and heirs at law?

6. What portions, if any, of testator's estate were and are by the provisions of will devised or bequeathed, and what portions were not so devised or bequeathed?

Hiram Arthur Pearsons died at Chicago, Illinois, July 7, 1889, leaving an olographic will, made in April, 1882, and being at the time of his death twenty-eight years of age.

Upon the hearing of the petition for the construction of this will, it was established that his father, Hiram Pearsons, deceased, owned in the block bounded by Clay, East, Merchant and Drumm streets, a frontage of one hundred and seventy-eight feet on Clay, running back to Merchant, and bounded on the east by East street, and had deeded to H. A. Pearsons the westerly sixty-eight feet (about) thereof, and had devised the remaining one hundred and ten feet to said H. A. Pearsons, his son, and his widow, in equal undivided shares; that said Hiram Pearsons died testate in 1870, leaving him surviving his said widow, Ann Charity (sometimes called Charity Ann) Pearsons, and his son, said H. A. Pearsons; that said Ann Charity Pearsons died testate in 1875, and that in her will, duly admitted to probate, it was provided that her two sisters, Polly Barton and Betsey Frances Mathewson, should receive the income from her said undivided one-half of said one hundred and ten feet during the term of their natural lives, or of the survivor of them, with remainder over to H. A. Pearsons; that up to the time of the death of said sisters the income of said property was divided equally between said H. A. Pearsons and said sisters, and the survivor of them; that June 30, 1889, the survivor of said sisters died. It was also shown upon said hearing that there are orphan asylums of various religious denominations, some in San Francisco and others in Marin and San Mateo counties, some being in existence at the time the will was executed, and some established since said date, but prior to the death of said Pearsons, and there being more than one orphan asylum controlled by certain religious denominations, although organized independently.

It was also shown that among the claimants, as heirs, are two half-sisters of Hiram Pearsons, father of Hiram Arthur Pearsons, and five brothers and sisters of Ann Charity Pearsons, mother of deceased, and also that there are certain children of deceased, uncles and aunts of Hiram Arthur Pearsons.

The will in question is in the words and figures following, to wit:

"IN THE NAME OF GOD, AMEN: I, Hiram A. Pearsons, of the City and County of San Francisco, and State of Califor-

nia, being of sound mind and memory, and considering the uncertainty of life, do therefore make, ordain, publish and declare this to be my last will and testament. That is to say—

"First: I give, devise and bequeath unto Betsey Frances Mathewson and Polly Barton, my aunts, the following described lots and pieces of land situated in the City and County of San Francisco, State of California, and laid down and described on the official map of the said city as follows, to wit: Commencing at a point on the south line of Washington street, which is one hundred and thirty-seven (137) feet six (6) inches east from the intersection of the east line of Drumm street where it intersects the south line of Washington street; thence running easterly on the southerly line of Washington street two hundred and ninety (290) feet to the eastern water front of said city; thence southeasterly along said east water front one hundred and forty-two (142) feet to the north line of Merchant street; thence in a western direction on what is known as the northern line of Merchant street, which line is distant one hundred and fifteen (115) feet from the southern line of Washington street, and running parallel therewith, to a point which is on said northern line of Merchant street and distant one hundred and thirty-seven (137) feet six (6) inches east of the eastern line of Drumm street; thence north at right angles to Washington street one hundred and fifteen feet to the point of commencement.

"Second: I do give, devise and bequeath unto Betsey Frances Mathewson and Polly Barton, my aunts, all real property which I hold jointly with them. And I direct that in the event of the death of either Betsey Frances Mathewson or Polly Barton prior to that of my own, all property of whatever nature herein bequeathed to them shall revert and vest in the survivor, her heirs and assigns forever. And furthermore: In the event of the death of both Betsey Frances Mathewson and Polly Barton prior to my decease, the aforesaid property, otherwise bequeathed to them, shall be sold at public auction to the highest cash bidder, the proceeds of said sale to be equally distributed among the differ-

ent orphan asylums of the City and County of San Francisco. And said asylums I request to be designated by the Judge of the Probate Court.

"Third: I do give, devise and bequeath unto Isabella Rogers Kinsey, wife of my former guardian, her heirs and assigns forever, all that property which is owned by me in the block bounded on the south by Clay street, on the west by Drumm street, on the north by Merchant street, and on the east by East street; excepting therefrom that portion which I hold jointly with Betsey Frances Mathewson and Polly Barton, and which has hereinbefore been bequeathed to them.

"Fourth: I do give, devise and bequeath unto A. G. Kinsey, my former guardian, his heirs and assigns forever, all my right, title and interest in blocks numbered 35, 36 and 37, at North Beach.

"Fifth: I do give, devise and bequeath unto Laura M. Witty, of Modesto, Stanislaus Co., Cal., daughter of Mrs. J. E. Hyslop, of the same place, all my stock in the Spring Valley Water Company, of the City and County of San Francisco, and I direct that in the event of my not being possessed of any of said stock at the time of my death then ten thousand ($10,000) dollars is to be paid to the said Laura M. Witty; or if there should not be enough of said stock at its market value at the time of my death to amount to ten thousand ($10,000) dollars, then the deficiency is to be paid to the said Laura M. Witty in cash, together with whatever stock there may be. But if the said Laura M. Witty should not survive me then this bequest (the 'Fifth') is to be distributed to orphan asylums as hereinbefore requested.

"Sixth: I do give, devise and bequeath unto Laura M. Witty five thousand dollars, to be held in trust and invested in some safe security by her mother, Mrs. J. E. Hyslop, who shall receive one-half of the interest thereon, if any there be, until the expiration of five years after my decease, when the remaining one-half of the interest, together with the principal, shall be given to the said Laura M. Witty. Or, in the event of the death of Mrs. J. E. Hyslop prior to that of the

said Laura M. Witty, the two preceding bequests ('Fifth' and 'Sixth') are to be paid from the moneys standing to my credit; and, if not sufficient, then from a fund created by the sale of notes, securities or other property.

"Seventh: I do give, devise and bequeath the remainder of my property of whatever kind to Betsey Frances Mathewson and Polly Barton, subject to the reversion before stated. All the above real property being situated in the City and County of San Francisco, State of California.

"Eighth: I do give, devise and bequeath unto T. C. Hill, of Western Springs, Illinois, all my right, interest and title of whatever kind to all real property in Cook County, Illinois. (To be used for charitable purposes.) Should any devisee or devisees of this will attempt to annul or set aside any bequest herein made, then the person so doing shall forfeit his or her bequest to the person whose bequest is so attacked. This I declare to be an olographic will. Betsey Frances Mathewson is the maiden name of Mrs. Julius T. Newell. And I do hereby nominate and appoint Elliot J. Moore the executor of this my last will and testament, and I do release him from the necessity of giving any bond or bonds as such executor.

"H. A. PEARSONS. (Seal.)

"San Francisco, August 9, 1882.

"San Francisco, April 13, 1885.

"The Fifth bequest, commencing on the second line of fourth page, and also the following, the Sixth, I now declare to be annulled. And I further direct that the benefits of these bequests (the Fifth and Sixth) shall be given to my aunts according to the provision of the seventh clause.

"H. A. PEARSONS. (Seal.) "

While the whole of the will is hereinabove set forth, there are only two clauses which it is necessary to construe in this proceeding, although it may be remarked that it is established by evidence that the testator left legal heirs him surviving; but this is not a proceeding to establish heirship, and the evidence in that behalf may be disregarded for the present purpose, nor need there now be any determination by this court as to the particular orphan asylums included within

the terms of the bounty of the testator, as any opinion upon these points would be premature and not binding when the matter shall come before the court in proper form for final decision.

The clauses of the will which it is necessary now to construe are as follows:

"Second: I do give, devise and bequeath unto Betsey Frances Mathewson and Polly Barton, my aunts, all real property which I hold jointly with them; and I direct that in the event of the death of either Betsey Frances Mathewson or Polly Barton prior to that of my own, all property of whatever nature herein bequeathed to them shall revert and vest in the survivor, her heirs and assigns forever; and, furthermore, in the event of the death of both Betsey Frances Mathewson and Polly Barton prior to my own decease, the aforesaid property otherwise bequeathed to them shall be sold at public auction to the highest cash bidder, the proceeds of said sale to be equally distributed among the different orphan asylums of the City and County of San Francisco; and said asylums I request to be designated by the Judge of the Probate Court.

"Third: I do give, devise and bequeath unto Isabella Rogers Kinsey, wife of my former guardian, her heirs and assigns forever, all that property which is owned by me in the block bounded on the south by Clay street, on the west by Drumm street, on the north by Merchant street, and on the east by East street, *excepting therefrom* that portion thereof *which I hold jointly* with Betsey Frances Mathewson and Polly Barton, and which has hereinbefore been bequeathed to them."

"Seventh: I do give, devise and bequeath the remainder of my property, of whatever kind, to Betsey Frances Mathewson and Polly Barton, subject to the reversions before stated."

First—As to the construction of the devise to Isabella Rogers Kinsey:

The three clauses above set forth, when read together— and they are the only clauses bearing upon this subject— show that the testator divided his property into two classes: First, the property held jointly with said Betsey Frances

Mathewson and Polly Barton; and, second, all other prop-
erty. The aim of this court is to arrive at the intent of
the testator, by an examination of the will and the circum-
stances surrounding its execution, and the age and experience
of the testator; and no authorities need be cited to sustain
this proposition.

As one of the devisees named in said will, and under the
facts admitted and claimed to have been proved at the time
of the hearing of the petition of the executor for the con-
struction of the will of said deceased, Mrs. Isabella Rogers
Kinsey claims the following described lot of land in the city
and county of San Francisco:

Commencing at a point on the northerly line of Clay street
distant two hundred and forty-seven feet and three inches
easterly from the corner formed by the intersection of said
northerly line of Clay street with the easterly line of Drumm
street, and running thence easterly along said northerly line
of Clay street one hundred and seventy-eight feet and nine
inches; thence at a right angle northerly and parallel with
said easterly line of Drumm street one hundred and fifteen
feet to the southerly line of Merchant street; thence run-
ning westerly and along said southerly line of Merchant
street one hundred and seventy-eight feet and nine inches;
thence at a right angle southerly and parallel with said
westerly line of Drumm street one hundred and fifteen feet
to said northerly line of Clay street and the point of com-
mencement.

In whom was the fee to this tract or parcel of land vested
on July 7, 1889, the date of the death of Hiram Arthur
Pearsons?

Upon this question, among others, the executor seeks the
instruction and advice of the court.

If it shall be determined to have been in Hiram Arthur
Pearsons at the time of his death, it is contended by her
counsel that upon his death the title to all of it vested *eo
instanti* in Isabella Rogers Kinsey, subject only to the usual
probate administration upon his estate in this court.

To arrive at a conclusion as to whom the fee to this parcel
of land was vested in on July 7, 1889, the date of the death

of Hiram Arthur Pearsons, it will be necessary to look carefully into the history of its title as disclosed by the record before the court.

On November 25, 1851, Hiram Pearsons, the father of Hiram Arthur Pearsons, was the owner in fee simple of the whole of said tract of land.

In 1854 the said Hiram Pearsons intermarried with Ann Charity Mathewson, and thereafter, in 1860, there was born to them a son, Hiram Arthur Pearsons, whose estate is now being administered in this court, and in which estate this proceeding is had.

The entire property above described. was, therefore, the separate property of Hiram Pearsons, having been acquired by him three years prior to his marriage to Ann Charity Mathewson.

On April 12, 1866, Hiram Pearsons made his last will and testament, wherein he gave and bequeathed all the rest, residue and remainder of his estate, including all the tract of land above described, to his wife, Ann Charity Pearsons, and his son, Hiram Arthur Pearsons, share and share alike.

On April 30, 1867, one year and eighteen days after making this will, Hiram Pearsons made, executed, delivered and caused to be recorded a deed in writing under his hand and seal, in due form of law, conveying to his said son, Hiram Arthur Pearsons, a portion of the tract of land above described, and which portion so conveyed to his son was, and is, particularly described as follows, to wit:

Commencing at a point on the northerly line of Clay street distant two hundred and forty-seven feet and three inches easterly from the corner formed by the intersection of the northerly line of Clay street with the easterly line of Drumm street, and running thence easterly along the northerly line of Clay street sixty-eight feet and nine inches; thence at a right angle northerly and parallel with said easterly line of Drumm street one hundred and fifteen feet to the southerly line of Merchant street; thence running westerly along said southerly line of Merchant street sixty-eight feet and nine inches; and thence at a right angle southerly and parallel with said easterly line of Drumm street one

hundred and fifteen feet to said northerly line of Clay street and point of commencement.

By virtue of this deed of conveyance from Hiram Pearsons to Hiram Arthur Pearsons the tract of land was segregated, and as to the legal title it thereafter stood as per this diagram:

DRUMM STREET.

EAST STREET.

On August 11, 1868, one year, three months and eleven days after making this deed to his son, Hiram Arthur Pearsons, Hiram Pearsons, the father, died, leaving the above-mentioned will, dated April 12, 1866, as his last will and testament, and leaving surviving him, as his only heirs at law, his widow, Ann Charity Pearsons, and his said son, Hiram Arthur Pearsons, his and their only issue.

By decree of final distribution of the estate of Hiram Pearsons, all the rest, residue and remainder of his estate was distributed, in the language of the decree of distribution, to Ann Charity Pearsons and Hiram Arthur Pearsons, "share and share alike, each of them being entitled to one equal

undivided one-half part thereof,'' and thereupon the tract of land originally hereinabove described as being 178.9x115, stood as to title as per this diagram:

DRUMM STREET. ·

CLAY STREET.

247.3

115

68.9

Hiram Arthur Pearsons, by deed from his father, Hiram Pearsons, April 30, 1867.

110

Undivided one-half each in Ann Charity Pearsons and Hiram Arthur Pearsons, under decree of distribution of estate of Hiram Pearsons.

MERCHANT STREET.

N

EAST STREET.

Notwithstanding the fact that Hiram Pearsons owned only at the time of his death the lot fronting one hundred and ten feet on Clay street, with a uniform depth of one hundred and fifteen feet back to Merchant street, yet through error the whole lot, 178.9x115, was included in the inventory of his estate, and this error was perpetuated throughout the entire administration of his estate down to and including the decree of distribution of his estate.

In the decree of distribution of the estate of Hiram Pearsons, dated May 8, 1871, we find the following:

''Third: All the rest and residue of said estate of said decedent, both real and personal, remaining in the hands of said executrix and executors and particularly described as follows, viz.:

"All that certain lot, piece or parcel of land situated in said City and County of San Francisco, commencing on the northerly line of Clay street at a point distant two hundred and forty-seven and a quarter (247¼) feet easterly from Drumm street, running thence easterly along said line of Clay street to East street, thence northerly along East street to Merchant street, thence westerly along Merchant street to a point opposite the place of beginning, thence southerly parallel with Drumm street to the place of beginning, excepting, however, the half of a fifty-vara lot, conveyed by said Hiram Pearsons in his lifetime to the Clay Street Wharf Company, by deed dated February 6, 1855, and recorded in the Recorder's office of said city and county, in Liber 50 of Deeds, page 413.

"Also: [Then follows a description of a large quantity of other real and personal property, and the decree then continues and concludes as follows:]

"Is hereby assigned, set over, transferred and distributed to said Ann C. Pearsons, the widow, and said Hiram Arthur Pearsons, the minor son, of said Hiram Pearsons, deceased, share and share alike—that is to say, the one equal undivided half part thereof to said Ann C. Pearsons, and the other equal undivided half part thereof to said Hiram Arthur Pearsons.

"And it is further ordered: That said executrix and executors, upon payment and delivery of said residue as hereinbefore ordered and decreed, and upon filing due and proper vouchers and receipts therefor in this Court, be all and each of them fully and finally discharged from their trust as such executrix and executors."

It is claimed that this decree was operative only as to the lot of land fronting one hundred and ten feet on Clay street, with a uniform depth of one hundred and fifteen feet back to Merchant street, and that the decree could in no way affect the legal title to the lot 68.9x115, deed by Hiram Pearsons in his lifetime, on April 30, 1867, to his son, Hiram Arthur Pearsons. At the time of this distribution of Hiram Pearsons' estate, his son, Hiram Arthur Pearsons, was but eleven years old.

Notwithstanding the terms of the decree of distribution of Hiram Pearsons' estate, it is claimed that the minor son, Hiram Arthur Pearsons, continued to be the sole owner of the lot fronting on Clay street, 68.9x115, previously deeded to him by his father on April 30, 1867, and by virtue of the decree of distribution in his father's estate he further became the owner, in the language of the decree, of "an equal, undivided one-half part" of the lot fronting on Clay street, 110x115, immediately adjoining on the east his separate property 68.9x115, above referred to.

Of the original lot of land fronting on Clay street, 178.9x 115, it seems, therefore, that after the decree of distribution of the estate of Hiram Pearsons, his son, Hiram Arthur Pearsons, was the sole owner of the most westerly 68.9x115, and was also the owner of an equal undivided one-half in common with his mother, Ann Charity Pearsons, of the adjoining 110x115, and equal in size to a lot 55x115.

The title to the remaining undivided lot, equal in size to 55x115, was then vested in Ann Charity Pearsons.

With this understanding of the then condition of the legal title to the land in question, we pass on to the next chronological event.

On May 16, 1874, Ann Charity Pearsons made her last will and testament, wherein, among other things, she provided as follows:

"I do give, devise and bequeath unto my beloved son, Hiram Arthur Pearsons, all real and personal property *which I own jointly with him,* together with the family portraits and silverware and my small diamond ring."

The testatrix also made the following provision:

"I give, devise and bequeath to my beloved sisters, Polly Barton and Betsey Frances Mathewson,. *for their use during the term of their natural lives, and to the survivor of them, share and share alike, all my interest in (describing other property),* .... *and also all the income from all the property which I own jointly with my son, Hiram Arthur Pearsons.* And I empower the said Polly Barton and Betsey Frances Mathewson, at their option, to sell and convert into cash any and all of said stocks, notes, securities and property, and to invest the proceeds arising therefrom as they shall

deem best, *and to enjoy the income thereof during their lives, and to the survivor of them.* And I direct that in the event of the death of either of the said Polly Barton or Betsey Frances Mathewson, the survivor shall have full power to sell said property and invest the proceeds as she shall deem proper, *the income arising therefrom to be for her sole use and benefit, and after the death of such survivor the whole of said property or proceeds thereof shall revert to my son, Hiram Arthur Pearsons.*''

Ann Charity Pearsons died in the same year, after having made this will, leaving surviving as her sole heir at law her said son, Hiram Arthur Pearsons. Her will was in due time admitted to probate, and her estate was finally distributed on December 22, 1875.

The only interest that Ann Charity Pearsons had at the time of her death in the lot of land fronting one hundred and ten feet on the north side of Clay street, and running through with a uniform depth of one hundred and fifteen feet to Merchant street, was an ''equal undivided one-half part thereof,'' and yet the decree of distribution in her estate provided, among other things, as follows:

''And also to Polly Barton and Betsey Frances Mathewson to their use during the term of their natural lives, share and share alike, and to the survivor of them, *all the income from the undivided half* of all the following described property situated in the City and County of San Francisco, and State of California, to wit:

''That lot commencing on the north line of Clay street at a point two hundred and forty-seven feet three inches from the northeast corner of Drumm and Clay streets; running thence easterly along the north line of Clay street 176 96/100 feet; thence at right angles northerly one hundred and fourteen feet to Merchant street 176 96/100 feet; thence at right angles southerly one hundred and fourteen feet to the point of beginning; also . . . . and in the event of the death of Hiram Arthur Pearsons before the deaths of Polly Barton and Betsey Frances Mathewson, or either of them. the above mentioned property, and the whole thereof, shall go to the said Polly Barton and Betsey Frances Mathewson, or the survivor of them, absolutely, share and share alike, their or

her heirs or assigns forever. And to Hiram Arthur Pearsons, the silverware, family pictures, and the small diamond ring, and all the property hereinbefore described, *subject only to the rights, interests and uses hereinbefore reserved to Polly Barton and Betsey Frances Mathewson, or to the survivor of them,* and also all the property, real, personal and mixed, hereinbefore described, or the proceeds thereof remaining after the death of Polly Barton and Betsey Frances Mathewson, and the survivor of them, *or to the survivor of them,* and also all the property, real, personal and mixed, hereinbefore described, or the proceeds thereof remaining after the death of Polly Barton and Betsey Frances Mathewson, and the survivor of them, and also any other property not now known or discovered which may belong to said estate, or in which the said estate may have any interest.''

It is claimed by counsel for Mrs. Kinsey that Ann Charity Pearsons, at the time of her death in 1874, had no interest in the lot of land 68.9x115, which had been conveyed on April 30, 1867, by Hiram Pearsons to his minor son, Hiram Arthur Pearsons, and as to the adjoining lot of land, 110x115, she only owned an equal undivided one-half with her son, Hiram Arthur Pearsons. At this time, December, 1875, the son was fifteen years of age.

It appears that the executor and his attorney in this present proceeding, at the time of filing the petition for the construction of the will of Hiram Arthur Pearsons, were still laboring under an erroneous impression as to the extent of the interest of Polly Barton and Betsey Frances Mathewson in this property during their lives. The petition, as originally filed, informed the court that they had a life interest in the income of one-half of the entire lot of land fronting on Clay street, 176 96/100x114, but if this were error it was corrected by an amendment to the original petition, and now, for the first time since the death of Hiram Pearsons, on August 11, 1868, more than twenty-two years ago, it is claimed that the probate record of the condition of the title to this lot of land 178.9x115 is correct, and as it always should have been.

During the lifetime of Polly Barton and Betsey Frances Mathewson they had the right only to claim the income from one-half of this lot 110x115, equal to a lot in size 55x115, and,

upon the death of the survivor of these two, Hiram Arthur Pearsons had the right to keep all the income for himself and in his own right.

This is the contention of counsel for Mrs. Kinsey, who claim, also, that the fee to the lot 110x115 was not disturbed or affected in any way by the death of the aunts, because the legal title to the entire piece had always been vested in Hiram Arthur Pearsons from the time of the death of his mother in 1874. The aunts practically had an annuity out of the land during their lives, and nothing more.

Polly Barton died May 25, 1888, and Betsey Frances Mathewson on June 30, 1889, neither of them leaving any surviving spouse, issue or lineal descendants, and on July 7, 1889, just one week after the death of the survivor of these two aunts, Hiram Arthur Pearsons passed away.

It is contended by counsel for Mrs. Kinsey that it was the intention of the testator to confirm to the aunts the income for their lives, and to perpetuate and secure it to them during their natural lives, so that they could rely upon it in the same manner as if he had survived.

It is contended, also, by counsel for Mrs. Kinsey that the testator, Hiram Arthur Pearsons, never did "hold jointly" any real property with Betsey Frances Mathewson and Polly Barton, or with either of them, and it is claimed that to "hold jointly" necessarily means ownership and right of possession, and upon this interpretation, as supported by the evidence as to the facts, depends the claim of Mrs. Kinsey to the whole of the parcel of land described in the third clause or paragraph of the will.

It seems to me that the adoption by the court of this view would not effectuate the intention of the testator. He evidently drew a distinction between "owning" and "holding," and although the second clause of the will may be inoperative, it is properly invoked to aid in the interpretation of the language of the third clause.

While it is true that a will takes effect only from the date of the death, it may be construed according to the circumstances and the facts existing in the mind of the testator at the date of execution. Whenever a testator refers to an actually existing state of things, or to what he considers to

be such a state, his language is referential to the date of the will, and not to what may exist at the time of his death, which is a prospective event.

In the construction of the description of the property devised to Mrs. Kinsey, "the court must assume, as nearly as possible, the position of the contracting parties, and consider the circumstances of the transaction between them, and then read the words used in the light of these circumstances."

There must be, in the first instance, a specific thing, specifically described, and a particular person or class clearly indicated. Here we have, as the first, "all that property which is owned by me" in the Clay street block, and that is given to the particular person described as "Isabella Rogers Kinsey, wife of my former guardian."

It is claimed by counsel for Mrs. Kinsey, in construing this specific devise, that this clause of the will speaks from the death of the testator as if it had been written immediately before his death. But I have attempted to show that in this case such a rule cannot apply, and that we should consider the circumstances as they existed at the time of the execution, or as the testator understood them to exist, and so considering this devise to Mrs. Kinsey, independent of the exception, we have, first, that which he held jointly with them devised to his aunts; secondly, that which was owned absolutely devised to Mrs. Kinsey.

In this case, it seems to me, the testator did not design to devise this whole lot to Mrs. Kinsey, as he first gave it to his aunts and then excepted it out of the specific devise to Mrs. Kinsey.

It is not difficult to determine what property was referred to by testator in the second clause of the will.

As to his other property, a portion is located in the block bounded by East, Merchant, Drumm and Clay streets, in San Francisco. He owned sixty-eight and nine-tenths feet frontage off Clay street, absolutely free from interference by anyone, but immediately adjacent to it was another tract of nearly one hundred and ten feet frontage on Clay street, of which he owned an undivided one-half, with remainder over of the other half upon terminations of the life estates of Betsey Frances Mathewson and Polly Barton. This tract he

had already given to his aunts, and, in case of their not surviving him, to charitable institutions.

He desired to give a specific tract to Mrs. Kinsey, and he selected the sixty-eight and nine-tenths feet above described. In clause 3 he gives all the property which is owned by him in said block to Isabella Rogers Kinsey, except the portion held jointly with his aunts and before bequeathed to them.

What is his intent, and does he express it? He does not specifically, by metes and bounds, locate the tract devised to Mrs. Kinsey, but he definitely cuts it out by segregating it from the portion held "jointly," as he calls it, with his aunts.

If they had lived, I do not think that Mrs. Kinsey could claim the whole tract as against them, or that she would be entitled to more than sixty-eight and nine-tenths feet. Then, if this be so, where is the intent, in the event of their death before him, that Mrs. Kinsey was to succeed to their devise? He had already provided that in such case the orphan asylums should be the objects of his bounty, and not Mrs. Kinsey.

This is one of the cases where a will speaks from its date, because it is manifest that the testator refers to an actually existing state of things.

In fact, the exceptions are not intended to provide for an extension of the devise to Mrs. Kinsey, but simply to define and limit the property devised. They do not refer to anything except the property, and therefore, as such words of description and definition, they must have the same meaning, whether these two aunts of testator lived or died. They were designed to make clear a devise of sixty-eight and nine-tenths feet, and did so at the time the will was made, and merely descriptive of it. While testator has not used the best method of expressing his intent, he has done so clearly, and no technical construction should be resorted to to defeat it.

In clause 7 he disposes of his whole residuum to his aunts, subject only to the reservations included in clause 2. So that, as far as the Kinsey devise is concerned, it seems clear that it was his intent to specifically cut out from all his property the portion owned in severalty by him, and in fee, in the block bounded by Drumm, Merchant, East and Clay, at the time of making the will, and devise it to the wife of his guardian; and, further, that in no circumstances was this devise to be

extended, and thus devised sixty-eight feet only to Mrs. Kinsey.

While it is doubtless true, as is so strongly set forth by counsel for Mrs. Kinsey, that this testator had before him, when drawing his own will, the models left by his father and mother, and closely patterned after them, it is also true that he was a layman and not a lawyer, a very young man, and, albeit a man of intelligence and considerable cultivation, he was not versed in the meaning of technical terms, and it should be presumed used words according to their ordinary meaning and in their popular sense. It seems to me that the words of this will, upon which such an elaborate argument is based, should not be subjected to such a strain as to force them out of the natural channel of construction into the narrow legal groove in which the testator's mind was clearly not accustomed to travel. It is the duty of the court to look for his general intent, to put itself in his place, to regard co-existent circumstances, and, if a technical construction of words and phrases is at variance with the obvious general intention, to apply a rule of interpretation which will give to language its ordinary effect.

It follows from the foregoing, if the views of the court be correct, that it should be judicially determined and declared, and it is so determined and declared, in answer to the prayer of the petitioner executor, that the testator, at the time he drew the will before this court for construction, owned the sixty-eight and nine-tenths foot lot in severalty, and he held the one hundred and ten foot lot jointly with his aunts, in the same manner that he had formerly held it with his mother; that by his will testator devised this last mentioned lot to his aunts in case they survived him, otherwise to the orphan asylums; that by the will this lot was expressly excepted from the devise to Mrs. Isabella Rogers Kinsey; that the devise to Mrs. Kinsey is a specific devise intending to operate only on the sixty-eight and nine-tenths foot lot, and that testator intended to and did except from the devise the one hundred and ten foot lot which he had already devised to his aunts.

---

The Principal Case was before the supreme court of California in 113 Cal. 577, 45 Pac. 849; 119 Cal. 27, 50 Pac. 929.